IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THERARON WELLS,

                Plaintiff,

  v.

PATRICK GOVIER, JORDAN DUVE,
RICKY STILWELL, MARK KARTMAN,
and LEBBEUS BROWN,

                Defendants.[1]

OPINION and ORDER

18-cv-693-jdp

---

Pro se plaintiff Theraron Wells, an inmate at Wisconsin Secure Program Facility (WSPF), brings this lawsuit under 42 U.S.C. § 1983, alleging that defendant WSPF correctional officers Patrick Govier, Jordan Duve, and Ricky Stilwell gave him medication on which he overdosed in attempts to harm himself. Dkt. 1; Dkt. 30. He says that these defendants were aware of the risk that he would attempt to harm himself with the medication because he was restricted by WSPF from keeping medication on his person due to his history of attempted self-harm. He also alleges that defendant Mark Kartman, WSPF security director, and defendant Lebbeus Brown, a WSPF unit supervisor, failed to train WSPF staff to ensure that Wells stopped receiving medication he wasn't allowed to have. Dkt. 30. After screening Wells's complaint and amended complaint under 28 U.S.C. §§ 1915 and 1915A, I granted Wells leave to proceed on claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law against Govier and Duve and on Eighth Amendment claims against Stilwell, Kartman, and Brown. Dkt. 16; Dkt. 35.

---

[1] I have adjusted the caption to reflect the correct spelling of defendants' names based on their proposed findings of fact, Dkt. 78.

Both sides have moved for summary judgment. Dkt. 52; Dkt. 70. Defendants also move to strike a document submitted by Wells, Dkt. 90, that he said was a declaration from correctional officer Michael Roth but that Roth says he never signed. Dkt. 98.

Wells has presented enough evidence to proceed to trial on his Eighth Amendment claims against Govier and Stilwell and his state-law negligence claims against Govier and Duve, so I will deny defendants' motion regarding those claims. But he hasn't shown that he is entitled to summary judgment on those claims, nor has he produced enough evidence to survive summary judgment on his other claims, so I will deny Wells's motion in its entirety and grant the remainder of defendants' motion.


CHALLENGED DECLARATION

Defendants submit a declaration from Roth in which he says that he did not sign the declaration submitted by Wells in Roth's name. Dkt. 99, ¶ 6. The fraudulent declaration's handwriting matches the handwriting in other documents submitted by Carlos Lindsey, a fellow inmate of Wells's who has previously interfered with this case by submitting other fraudulent documents. *Compare* Dkt. 90 *with* Dkt. 1 and Dkt. 13; *see also* Dkt. 18; *see also Lindsey v. Johnston*, No. 18-cv-398, 2018 WL 66062417 (W.D. Wis. Dec. 17, 2018).

In response to defendants' motion, Wells says that he didn't realize the declaration was fraudulent when he submitted it. Dkt. 100. He admits that Lindsey drafted the declaration but says that he believed Ross had signed it after Lindsey drafted it, as it was signed in red pen in accordance with WSPF staff practice. *Id.* Defendants don't ask me to dismiss Wells's case, only to strike the declaration and to forbid Wells from seeking legal assistance from Lindsey for the remainder of this lawsuit. Wells doesn't oppose defendants' motion. I will strike the declaration

as requested by defendants. But because of Lindsey's history of misconduct, I will forbid Wells from seeking legal assistance from Lindsey in this or any other case before this court. I will address Lindsey's role in this matter in a future order in one of Lindsey's pending cases, *Lindsey v. Johnston*, No. 18-cv-398 (W.D. Wis.).

UNDISPUTED FACTS

The following facts are undisputed except where noted.

**A. Background**

In 2018, Wells was confined in one of WSPF's restrictive housing units. Wells's unit primarily houses inmates in two categories of confinement: disciplinary separation and administrative confinement. Inmates in Wells's unit are sometimes subject to additional restrictions, one of which, a "keep on person" or "KOP" restriction, prohibits them from keeping any medication in their cells. KOP restrictions are reviewed periodically by a WSPF committee. At all times relevant to his allegations, Wells was on a KOP restriction because of his history of attempts to harm himself by overdosing on medication.

A whiteboard near the sergeant's station in the unit lists all inmates housed in the unit and any restrictions they have. During the period at issue, most restrictions, but not KOP restrictions, were also magnetically posted on inmates' cell doors. Unit Supervisor Brown directed WSPF staff to post KOP restrictions out of sight of other inmates, not on cell doors, to avoid violating the privacy provisions of the Health Insurance Portability and Accountability Act (HIPAA).[2]

---

[2] Wells contends that HIPAA concerns were not Brown's true motivation, citing communication from HSU staff saying that KOP restrictions are no more confidential than

Inmates in Wells's unit can receive medications in two ways: by ordering certain over-the-counter medications from the WSPF canteen or by obtaining a prescription from the Health Services Unit (HSU). In both cases, the medications are delivered by correctional officers. The parties don't describe how an inmate requests medication from the HSU. But to order over-the-counter medication from the canteen, the inmate copies order numbers from a canteen menu onto a Scantron order form. Two menus are available: one for inmates in administrative confinement, and one for inmates in disciplinary separation. The disciplinary separation menu, known as the "Step Canteen Menu," has fewer items available than the administrative confinement menu or "AC Canteen Menu." Dkt. 72–1. In particular, the AC Canteen Menu includes a package of acetaminophen containing 24 325-milligram pills, whereas the Step Canteen Menu includes acetaminophen only in two-count packages. *Id.*

After the inmate has completed the order form, he gives the form to a sergeant for review to ensure that the inmate used the correct menu and is allowed to have the requested items. If the sergeant approves the order, he sends it to the business office, whose staff check the order numbers against its list of restricted supplies and inmate restrictions. If the business office staff don't find any restricted items, they process the form electronically. The inmate's items are then placed into a bag along with an itemized receipt to be delivered to the inmate

---

any other restrictions posted on cell doors, such as dietary restrictions or other safety restrictions. But these communications occurred in 2019, after WSPF changed its policy and began posting KOP restrictions on cell doors. Wells also cites a declaration apparently submitted by Brown in a different case, *Collins v. Grochowski*, No. 18-cv-1684 (E.D. Wis.). But even assuming this declaration is admissible, it is consistent with Brown's statement in this case, as Brown identifies health information privacy concerns as the reason KOP restrictions weren't posted on cell doors at the time, Dkt. 92, ¶ 5. So I will take Brown's statement that he directed staff not to post KOP restrictions on cell doors because of HIPAA concerns to be undisputed.

by a correctional officer. Correctional officers aren't required to look at the whiteboard every day or before delivering canteen orders.[3]

**B. Correctional officer defendants**

On three occasions, Wells received medication from correctional officers that he should not have received under his KOP restriction and that he later took in attempts to harm himself through overdose. The parties agree that defendant Govier gave medication to Wells on the first occasion and that defendant Duve did so on the second. Wells says that defendant Stilwell brought him medication on the third occasion, which defendants deny.

**1. Defendant Govier**

On May 2, 2018, defendant Govier brought Wells a container of medication from the HSU. Wells told Govier that he was on a KOP restriction and wasn't allowed to have such medication in his cell, after which Govier did not give Wells the medication.

On May 8, 2018, Wells ordered a bottle of 24 acetaminophen pills from the canteen along with several other food and hygiene items. Govier delivered Wells's items, including the pills, on May 10. Wells didn't tell Govier that he had any suicidal intentions or that he intended to use the pills to harm himself. But Wells does say that he told Govier that he was still on a KOP restriction. He supports this with an affidavit from Eric Conner, a fellow WSPF inmate, who says that he heard Wells tell Govier about the KOP restriction. Dkt. 56, ¶ 6. Conner says that Govier replied, "Man, if canteen let you order then I don't care. Just don't do

---

[3] Wells objects to this fact. He says that because inmates' statuses can change daily, correctional officers must look at the whiteboard daily to ensure that they comply with inmates' restrictions. But Wells doesn't say that WSPF policy requires staff to do so, only that they would have to do so to keep up with changes in inmates' conditions. Wells is correct that this would be a good practice, but that doesn't show that it is required by WSPF policy, so I will take this fact to be undisputed.

anything stupid on my shift." *Id.* Govier disputes this, saying in a declaration that Wells didn't tell him about his KOP restriction on this date. Dkt. 71, ¶¶ 10, 21.

Wells didn't report any thoughts of self-harm or intent to harm himself in visits with WSPF psychological staff just before he received the pills from Govier. But on May 20, Wells took the pills in an attempt to harm himself. He was taken to a local hospital, after which he was returned to WSPF for clinical observation.

Wells filed a grievance on May 23 regarding Govier's delivery of acetaminophen. The grievance was processed by an institution complaint examiner, who learned that Wells had obtained the pills by copying the item code from the AC Canteen Menu even though he should have been allowed to order only from the Step Canteen Menu. The examiner affirmed Wells's grievance and sent it to defendant Kartman around June 4.

2. **Defendant Duve**

On May 29, 2018, nine days after his overdose, Wells again ordered a bottle of 24 acetaminophen pills and several food items from the canteen. Defendant Duve brought Wells's items on May 31. Wells didn't tell Duve about his KOP restriction or say that he had any intention of harming himself. Duve says that he didn't check the whiteboard before delivering Wells's items and was unaware that Wells was on a KOP restriction. Dkt. 72, ¶ 16.

Psychological staff notes from just before Wells received the pills from Duve indicate that he denied thoughts of self-harm. But on June 11, Wells took a handful of the pills in another attempt to harm himself. He was taken to a hospital for treatment and was then returned to WSPF for clinical observation.

6

On June 7, four days before his attempted overdose, Wells filed a grievance regarding Duve giving him medication.[4] The examiner processing Wells's grievance learned that he had again used codes from the AC Canteen Menu rather than the Step Canteen Menu. The examiner affirmed Wells's grievance and sent it to Kartman around June 29.

### 3. Defendant Stilwell

On the evening of November 16, 2018, during WSPF staff's second shift, the WSPF HSU sent Wells a blister package of omeprazole, a drug used to treat stomach and esophagus problems. The parties dispute whether defendant Stilwell was the officer who delivered the omeprazole to Wells. In a declaration, Wells identifies Stilwell as bringing the omeprazole. Dkt. 49, ¶ 13. But Stilwell says in his declaration that he was working as a support officer at the time and that another correctional officer was responsible for distributing medications that evening. Dkt. 73, ¶¶ 13, 14. He says that sometimes when he is working as a support officer, a sergeant will give him an individual package of medication to deliver to an inmate, but he says he only recalls that happening during third shift, not second shift. *Id.*, ¶ 16.

The name of the medication was written in red on the blister pack, signifying that Wells was on a KOP restriction and that the medication should have been placed on the medication cart to be given to Wells in individual doses rather than delivered directly to Wells.

Wells wasn't feeling suicidal when he received the omeprazole and he didn't tell the officer who delivered it that he was on a KOP restriction or that he intended to harm himself. But three days later, he again attempted to overdose on pills, taking omeprazole as well as 30

---

[4] The parties don't address why Wells was allowed to keep the medication after filing the grievance, but none of Wells's claims concern this issue.

Tylenol pills he had obtained from other inmates. He was again taken to the hospital, after which he was returned to WSPF for clinical observation.

**C. Supervisory defendants**

Security Director Mark Kartman is responsible for developing, implementing, and monitoring WSPF's security goals, policies, and procedures. Corrections Unit Supervisor Lebbeus Brown oversaw the unit in which Wells was housed during the period at issue in this lawsuit. He is responsible for the security, treatment, and general living conditions of all inmates in the unit.

Brown received a call about Wells's May 20, 2018 attempted overdose shortly after it happened. He was told that the incident report would be sent to Kartman for review and possible action. Kartman reviewed the incident report (which did not discuss how Wells had obtained the medication or mention Wells's KOP restriction) and forwarded it to the Psychological Services Unit (PSU), the HSU, Wells's social worker, and Brown. Defendants don't describe any other action that Kartman or Brown took at this time.

Kartman received a copy of the examiner's report concerning Wells's grievance against Govier around June 4, but Brown didn't receive a copy of the grievance and wasn't informed of it. (At this time, Wells had already received acetaminophen pills from Duve but hadn't yet attempted to overdose with them.) The report described how Wells had ordered from the wrong canteen menu and discussed his KOP restriction. Kartman then "followed up with supervisory staff about the separate ordering sheets and discussed options for improving the canteen medication ordering process and the importance of medication delivery and the

8

diligence of officers when completing the task."[5] Dkt. 74, ¶ 14. The parties don't address whether Brown was among the supervisory staff with whom Kartman discussed these issues.

After Wells's attempted overdose on June 11, Kartman again reviewed an incident report (which, like the first incident report, didn't discuss how Wells had obtained the medication or mention his KOP restriction) and forwarded it to the PSU, the HSU, Wells's social worker, and Brown. Brown confirmed that Wells was on a KOP restriction in the WSPF computer system and verified that the restriction was listed on the whiteboard.

Kartman received a report concerning Wells's grievance against Duve around June 29, but Brown didn't receive a copy and wasn't informed of it at that time. The report discussed how Wells had again ordered from the wrong canteen menu and mentioned his KOP restriction. Kartman "followed up with supervising staff to discuss the importance of medication delivery and for officer staff to be diligent when completing the task." *Id.*, ¶ 21. Again, the parties don't address whether Kartman included Brown among the supervisory staff with whom he discussed these issues.

After Wells attempted to overdose on November 19, 2018, Kartman again received an incident report, which he forwarded to the PSU, the HSU, Wells's social worker, and Brown. Unlike the previous two reports, this report noted that Wells was on a KOP restriction. After Brown learned about Wells's overdose, he again confirmed that Wells was on a KOP restriction

---

[5] Wells objects to defendants' description of Kartman's responses to this grievance and his other grievances. He says that defendants don't support them with evidence and don't specify which supervisors Kartman talked to or when he talked to them. But defendants support these facts with Kartman's declaration, as provided under Federal Rule of Civil Procedure 56(c)(1)(A). Wells offers no legitimate grounds for challenging these proposed facts, so I will take them to be undisputed.

and verified that it was listed on the whiteboard. Because Wells had been given a full blister pack of medication, Brown says that he would normally contact HSU to learn why the medication hadn't been placed on the medication cart to give Wells individual doses.[6]

Kartman received a report concerning Wells's grievance against Stilwell, but Brown did not receive a copy at that time. The parties don't describe Kartman or Brown's actions following this grievance.

Kartman says that each time he became aware that Wells obtained medication despite his KOP restriction, he "addressed the situation and conducted additional training where necessary," though he does not describe what training he provided. *Id.*, ¶ 29. WSPF has no specific training for security staff regarding KOP restrictions, but they are trained on medication handling during their on-the-job training.

ANALYSIS

Both sides have moved for summary judgment. To survive defendants' motion for summary judgment on each of his claims, Wells must submit admissible evidence sufficient to convince a reasonable jury that he is entitled to relief for that claim. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). To be granted summary judgment on a claim, Wells must show that the material facts necessary to prove his claim are not in genuine dispute and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

---

[6] Defendants say that Brown did speak with HSU, Dkt. 96, ¶ 85, but in his declaration, Brown says only that in this type of situation, he "would" do so, Dkt. 75, ¶ 14.

## A. Correctional officer defendants

Wells says that Correctional Officers Govier, Duve, and Stilwell violated the Eighth Amendment because they deliberately ignored the risk that he would attempt to harm himself when they gave him medication. He also brings claims under Wisconsin negligence law against Govier and Duve based on this conduct.

### 1. Eighth Amendment claims

The Eighth Amendment prohibits prison officials from deliberately ignoring prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To prove his Eighth Amendment claims against Govier, Duve, and Stilwell, Wells must prove both an objective and a subjective element. *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). First, he must show that he had an objective, serious medical need. *Id.* Wells's tendency to harm himself by overdosing on medication meets this standard because it subjects Wells to a substantial risk of serious harm. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (risk of suicide is an objectively serious harm). Second, he must show that the individual defendants consciously ignored the risk that his medical need posed to his health. *Collins*, 462 F.3d at 760. To prove the subjective element against a defendant, he must show that the defendant "(1) subjectively knew [Wells] was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Id.*

Defendants challenge only the first component of the subjective element, contending that Wells has not identified evidence from which a reasonable jury could find that Govier, Duve, and Stilwell were subjectively aware that Wells was at substantial risk of self-harm. Defendants are correct regarding Duve and Stilwell, but not Govier.

Wells's primary argument is that all three correctional officers must have known that he was on a KOP restriction because it was posted on the whiteboard. WSPF correctional officers were not required to check the whiteboard before delivering medication. But even if they had been required to do so, that would show only that defendants *should* have known about Wells's KOP restriction, not that they *did* know about it, because they might not have looked at the whiteboard despite the requirement. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("It is not enough [under the Eighth Amendment] that a reasonable prison official would or should have known that the prisoner was at risk."). I must therefore consider whether Wells has evidence that the correctional officer defendants learned of Wells's KOP restriction through some other means.

Regarding Govier, the parties dispute whether Wells told him that he was on a KOP restriction on May 10. Wells says that he told Govier about his restriction and that Govier responded, "Just don't do anything stupid on my shift," but Govier denies that Wells told him about the restriction on this occasion. A jury could believe Wells's testimony, which would show that Govier knew of Wells's KOP restriction and the reason for the restriction—the risk that Wells might try to harm himself with the pills. But a jury could also believe Govier's testimony and find that he had no subjective knowledge of this risk. So there is a genuine issue of material fact regarding this claim, and neither side is entitled to summary judgment on it.

Regarding Duve, Wells didn't tell Duve that he was on a KOP restriction, and Wells doesn't allege that Duve said he was aware of Wells's KOP restriction. The only evidence Wells provides to suggest that Duve knew he was on a KOP restriction is Wells's deposition testimony that Duve said he was aware that Wells was on disciplinary separation, which would limit Wells to ordering from the Step Canteen Menu. Wells testified that Duve said that Wells wasn't

supposed to receive food items but that Duve gave them to him anyway, saying, "I told him he['s] not supposed to get canteen, let him get them. He's lucky this time." Dkt. 76-2 (Wells Dep. 65:20–22). Wells testified that when Duve picked up the bottle of pills, Wells said, "Man, are you gonna let me get those too?" to which Duve replied, "Man, you love this, man. You got your canteen. You got everything," and gave him the pills. *Id.* at 66:4–8.

Wells's testimony, if believed by a jury, would show that Duve gave food and pills to Wells despite knowing that Wells shouldn't receive the items. But it wouldn't show directly that Duve was aware of Wells's KOP restriction, as opposed to the general restrictions on inmates in disciplinary separation. Wells says that a jury could infer that Duve must have known about his KOP restriction because the disciplinary separation restrictions applied only to food items, not to pills. So, Wells argues, if Duve knew that Wells was not supposed to receive the pills, he must have been aware of the KOP restriction. But this inference doesn't follow. While in disciplinary separation, Wells was limited to ordering items on the Step Canteen Menu; the bottle of pills was not on that menu. So even without the KOP restriction, the pills were contraband that Wells should not have. Wells hasn't identified any evidence that would support a reasonable inference that Duve was aware of Wells's KOP restriction.

Regarding Stilwell, although the parties dispute whether he was the officer who gave omeprazole to Wells on November 16, Wells's testimony that Stilwell did so is enough for summary judgment purposes. Wells did not tell Stilwell that he was on a KOP restriction and Stilwell said nothing suggesting that he was aware of the restriction. But the medication's name was written in red on the blister pack, which, if Stilwell saw it, would inform him that Wells was on a KOP restriction. A jury could reasonably infer that Stilwell looked at the medication's name before handing it to Wells and that he was aware of Wells's KOP restriction. But a jury

13

could also reasonably decline to draw this inference, so neither side is entitled to summary judgment on this claim.

   2. **Negligence claims**

Wells also brings state-law negligence claims against Govier and Duve (but not Stilwell) for giving him medication despite his KOP restriction. To show that each defendant was negligent in giving him his medication, Wells must show that each defendant breached a duty that he owed to Wells that resulted in harm to him. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860.

For the same reasons that a reasonable jury could conclude that Govier violated the Eighth Amendment, they could conclude that he acted negligently toward Wells. Regarding Duve, a reasonable jury could conclude that he was negligent in giving medication to Wells despite knowing that he should not have been allowed to order it and in failing to check the whiteboard to determine whether Wells was on a KOP restriction.

Defendants contend that even if Govier and Wells acted negligently, they are entitled to immunity for their actions. State employees like Govier and Wells are generally entitled to immunity under Wisconsin common law when they act with discretion. *Kimps v. Hill*, 200 Wis. 2d 1, 546 N.W.2d 151, 160 (1996). But they are not immune when performing ministerial acts—that is, acts that are so "absolute, certain and imperative . . . that nothing remains for judgment or discretion." *Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 72 Wis. 2d 282, 240 N.W.2d 610, 621–22 (1976).

Defendants say that Govier and Duve acted with discretion in giving medication to Wells because if they had been aware of Wells's KOP restriction, they would have had to weigh conflicting orders against each other. On the one hand, they had a directive to deliver canteen

14

orders to Wells that had been approved by the unit sergeant and the business office; on the other, they had a directive not to give medication to an inmate on a KOP restriction. But this argument fails because Wells has produced evidence that both Govier and Duve were aware that under WSPF policy, Wells should not have received the canteen orders at all—for Govier, Wells's testimony that he told him about his KOP restriction, and for Duve, Wells's testimony that Duve knew Wells was on a disciplinary separation restriction. This evidence would show that each defendant was aware that the directive to deliver the canteen order was based on a mistake and that WSPF policy barred delivery of the medication. Defendants offer no evidence that WSPF correctional officers are given discretion to ignore KOP and disciplinary restrictions, and it would take no judgment or discretion to determine that a valid KOP restriction would trump an order to deliver canteen items that the officer knew to be based on a mistake. So Govier and Duve's duty to not deliver the medication was ministerial, not discretionary, and they aren't entitled to immunity under *Lister*.

Defendants also contend that Wells's manipulation of the canteen ordering process and his overdose attempts were superseding causes of Wells's harm—that is, each of those actions was an intervening force that broke the chain of causation between the defendant's negligence and the plaintiff's harm, *McMahon v. St. Croix Falls Sch. Dist.*, 228 Wis. 2d 215, 596 N.W.2d 875, 880–81 (Ct. App. 1999). But regarding the canteen ordering process, Wells placed his orders before each officer gave him medication, not after, so misconduct by Wells in ordering the medication would not break the causal chain between each officer giving Wells the medication and the harm caused by his overdose attempts. Regarding Wells's overdose attempts, defendants cite a 1960 Wisconsin case that describes suicide as breaking the chain of causation between the wrongful act and the plaintiff's death. *Bogust v. Iverson*, 10 Wis. 2d

15

129, 102 N.W.2d 228, 233 (1960). But *Bogust* recognizes an exception to this rule if the defendant "had notice of conduct . . . evidencing a purpose to inflict self-injury." *Id.* at 232. Wells was under a KOP restriction because of the risk he would attempt to overdose on medication, and he says that both Govier and Duve were or should have been aware of that restriction. The fact that he attempted to overdose after receiving medication was a foreseeable result of Govier and Duve's conduct, so his overdose attempts did not break the causal chain.

I will deny defendants' motion for summary judgment regarding Wells's negligence claims against Govier and Duve. But a reasonable jury could also conclude that neither defendant acted negligently, so I will deny Wells's motion for summary judgment regarding these claims.

**B. Supervisory defendants**

Wells brings claims against Kartman and Brown under the Eighth Amendment, alleging that they failed to train WSPF staff to prevent staff from giving Wells medication he shouldn't possess under his KOP restriction. To be liable under § 1983, a defendant must be personally involved in the constitutional deprivation in some way. *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003). This requires Wells to do more than merely show that Kartman and Brown supervised the correctional officers who gave him medication. *Burks v. Raemisch*, 555 F.3d 592, 593–94 (7th Cir. 2009). For each supervisory defendant, Wells must show that "deliberate action attributable to the [defendant] directly caused [Wells's] deprivation." *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).

Wells says that after his first attempted overdose, Kartman and Brown should have taken steps to prevent him from obtaining medication despite his KOP restriction by ordering from the wrong canteen menu. But although Kartman and Brown became aware of Wells's

overdose attempt shortly after it happened, Kartman didn't learn that Wells had obtained medication despite his KOP restriction or how he had obtained it until Kartman received a copy of the grievance examiner's conclusions on June 4—after Wells had already obtained his second bottle of pills. It's unclear when Brown learned this information, but it's undisputed that it was after Kartman did. Because they learned this information after Wells had already received his second bottle of pills, no action they might have taken could have stopped that from happening.

Wells obtained the pills he used in his third overdose attempt from the HSU, which uses a separate ordering process from the canteen, so any steps Kartman and Brown might have taken in relation to the canteen ordering process couldn't have stopped him from obtaining pills from the HSU. They might have gone further than the canteen by implementing a blanket rule requiring all correctional officers to check the whiteboard for KOP restrictions before delivering any medications to prisoners. But the possibility that Kartman and Brown might have implemented a better policy doesn't mean that they consciously disregarded the risk to Wells. *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."). The existence of other precautions to prevent a harm from occurring weighs against an Eighth Amendment claim at summary judgment, *Butera*, 285 F.3d at 607–08, and WSPF already had a practice in place to prevent inmates on KOP restrictions from receiving HSU medications they shouldn't—it wrote the medication name in red on the blister pack. Wells has produced no evidence that suggests that Kartman and Brown had reason to believe that this practice was ineffective, so he hasn't shown that their failure to implement a blanket rule regarding the whiteboard was a deliberate decision.

So I will grant defendants' motion for summary judgment on Wells's claims against Kartman and Brown.

**C. Qualified immunity**

Defendants contend that they are entitled to qualified immunity on all of Wells's Eighth Amendment claims. The only remaining Eighth Amendment claims are the ones against Govier and Stilwell.

Qualified immunity would apply to these claims if the law regarding the claims was not clearly established at the time. *Carroll v. Carman*, 574 U.S. 13, 16 (2014). But if the jury believes Wells's allegations that Govier and Stilwell gave him pills knowing about his KOP restriction, they would not be entitled to qualified immunity. *See Estate of Clark v. Walker*, 865 F.3d 544, 551–52 (7th Cir. 2017) ("[Plaintiff prisoner's] right to be free from deliberate indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012."). So qualified immunity does not apply to these claims.

CONCLUSION

Wells has shown that a reasonable jury could find that Govier and Stilwell consciously ignored the risk that Wells would harm himself when they gave medication to Wells. And he has shown that a reasonable jury could find that Govier and Duve acted negligently when each of them gave medication to Wells. Wells's case will proceed to trial on those claims. But defendants have also produced evidence that would allow a reasonable jury to reach the opposite conclusions, so neither side is entitled to summary judgment on these claims. Wells hasn't produced evidence that would support a jury verdict in his favor on the rest of his claims, however, so I will grant defendants' motion for summary judgment regarding Wells's remaining

18

claims, and I will deny Wells's motion for summary judgment in its entirety. I will also grant defendants' motion to strike the fraudulent declaration of Michael Roth. I will follow this order with a "trial preparation order" that will include specific instructions about how Wells should present his claims at trial.

ORDER

IT IS ORDERED that:

1. Defendants' motion to strike the fraudulent declaration of Michael Roth, Dkt. 98, is GRANTED. Plaintiff is directed to seek no more legal assistance from Carlos Lindsey for the remainder of this lawsuit and in any future lawsuit in this court.

2. Plaintiff Theraron Wells's motion for summary judgment, Dkt. 52, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 70, is DENIED with respect to plaintiff's Eighth Amendment claims against Govier and Stilwell and plaintiff's state-law negligence claims against Govier and Duve; the motion is GRANTED regarding the remainder of plaintiff's claims. Defendants Mark Kartman and Lebbeus Brown are DISMISSED from the case.

Entered December 27, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge